# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MOSES STRYKER,            }

        }

    **Plaintiff**          }

        }

**v.**                  }    **Case No.: 2:16-cv-00832-LCB**[1]

        }

CITY OF HOMEWOOD, et al.,    }

        }

    **Defendants.**        }

## MEMORANDUM OPINION AND ORDER

Plaintiff Moses Stryker brings this action under 42 U.S.C. § 1983, against the City of Homewood, Alabama ("the City"), and police officers Jason Davis, Frederick Blake, and Brian Waid, in their individual capacities.[2]  Mr. Stryker alleges that Officers Davis, Blake, and Waid used excessive and unnecessary force while arresting him in the early morning hours of May 23, 2014.  In Count I of his second amended complaint,[3] Mr. Stryker asserts an excessive force claim against

---

[1] This matter was previously assigned to the Honorable Virginia Emerson Hopkins.  The case was reassigned to the undersigned, Judge Liles C. Burke, on October 23, 2018.  (Doc. Entry 106).

[2] The individual defendants were police officers with the City of Homewood at the time of the events described in the second amended complaint.  The Court is unaware of their current employment status.

[3] Plaintiff's initial complaint asserted claims against the City and the individual defendants for excessive force, illegal seizure, and false arrest under Section 1983; excessive force and illegal seizure against the City's police chief, Jim Roberson; and state law claims against all defendants for assault and battery, negligent hiring; negligent training and supervision, and abuse of process.

the individual defendants under 42 U.S.C. § 1983. In Count II, he asserts a Section 1983 claim against the City for failure to train and supervise. Mr. Stryker asserts state law claims against only the individual defendants for assault and battery (Count III), negligence (Count IV), and wantonness (Count V).

The matter is now before the Court on a motion for summary judgment filed by the City (Doc. 87), and a separate motion for summary judgment filed collectively by Officers Davis, Blake, and Waid. (Doc. 88). The motions have been fully briefed by all parties to the case.[4] The individual defendants argue that they are entitled to qualified immunity as to Mr. Stryker's Section 1983 claim. As to the state law claims, they argue that they are entitled to peace officer immunity under Ala. Code § 6-5-338(a). The City argues that because Mr. Stryker cannot survive summary judgment on his Section 1983 claim against the individual defendants, his Section 1983 claim against the City necessarily fails. For the reasons set forth below, the Court finds that the City's and the defendants' motions for summary judgment are due to be **GRANTED** with respect to Mr. Stryker's Section 1983 claims in Counts I and II. The Court declines to exercise

---

(Doc. 1). Plaintiff moved to voluntarily dismiss his claims for illegal seizure, false arrest, and abuse of process, (Doc. 21), and subsequently filed an amended complaint. (Doc. 39). In his amended complaint, plaintiff did not name Chief Roberson as a defendant; the Court therefore terminated Chief Roberson as a defendant. (Doc. 64). Plaintiff filed a second amended complaint with leave of Court per Judge Hopkins. (Doc. 69). The claims before this Court include those reflected in the plaintiff's second amended complaint, as identified above.

[4] Although the individual defendants filed a collective summary judgment motion (Doc. 88), the parties took a different approach to briefing the motion, with Officers Blake and Waid submitting a joint brief (Doc. 90) and Officer Davis submitting a brief of his own. (Doc. 92).

supplemental jurisdiction over Mr. Stryker's state law claims in Counts III, IV, and V, and these claims are due to be **DISMISSED WITHOUT PREJUDICE**.

## I.     Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "'Genuine

disputes [of material fact] are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record.'" *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)). "A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage."). Even if the Court doubts the veracity of the evidence, the Court cannot make credibility determinations of the evidence. *Feliciano*, 707 F.3d at 1252 (citing *Anderson,* 477 U.S. at 255). However, conclusory statements in a declaration cannot by themselves create a genuine issue of material fact. *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

In sum, the standard for granting summary judgment mirrors the standard for a directed verdict. *Anderson*, 477 U.S. at 250 (citing *Brady v. Southern R. Co.*, 320 U.S. 476, 479–480 (1943)). The district court may grant summary judgment when, "under governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party . . . . If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." *Id*. at 249–50 (internal citations omitted).

## II.    Statement of Facts

Plaintiff Moses Stryker is a 58 year-old male who, in 1989, immigrated to the United States from Liberia, West Africa. (Doc. 69, p. 1, ¶ 1; Doc. 91-1, pp. 369–71, 482). Mr. Stryker is a naturalized citizen and permanent resident of the United States. (Doc. 69, p. 1, ¶ 1). Prior to coming to America, Mr. Stryker worked for eleven years as a police officer for the Liberian National Police, specifically, within the criminal investigation division. (Doc. 91-2, pp. 6–8). In 2003, Mr. Stryker began driving for Swift Transportation as a truck owner and operator. (Doc. 91-1, p. 379).

The story begins in the early morning hours of May 23, 2014, on Highway 280 in Birmingham, Alabama. Mr. Stryker and Musie Ibedingl, a truck driver whom Mr. Stryker was training for his employer, Swift Transportation, were traveling on Highway 280 around midnight when they allegedly side-swiped a sedan driven by Tammy Barnette. (Doc. 91-2, p. 10; Doc. 101-1, p. 5). Mr. Stryker and Mr. Ibedingl were unaware of having hit Ms. Barnette (Doc. 91-1, pp. 444, 467), and they continued to drive toward their delivery destination at the Walmart Supercenter on Lakeshore Drive in Homewood, Alabama. (Doc. 91-2, pp. 11, 23; Doc. 101-1, p. 8). Once at Walmart, shortly before 2:00 a.m., Mr.

Ibedingl struggled to maneuver the truck, an eighteen wheeler, in the manner necessary to park at the loading dock. (Doc. 91-1, p. 385; Doc. 91-2, pp. 10–11). Mr. Stryker traded places with Mr. Ibedingl and assumed the driver's position. (Doc. 91-2, p. 11). Moments later, Ms. Barnette appeared in her vehicle—having followed the truck for approximately ten miles from Highway 280 to the Walmart shopping center—and parked her car in front of Mr. Stryker's truck in an apparent attempt to prevent Mr. Stryker from leaving the scene. (Doc. 91-2, pp. 11–12; Doc. 101-1, p. 6). Ms. Barnette indicated to Mr. Stryker that she would not move her car until the police arrived. (Doc. 91-2, p. 11). Ms. Barnette's boyfriend, Merle Bailey, was also present at the Walmart shopping center in a separate vehicle which was parked near Ms. Barnette. (Doc. 101-1, pp. 7–8). Mr. Stryker and Mr. Bailey had a brief verbal exchange. (Doc. 101-1, p. 8). Mr. Stryker testified that Mr. Bailey smelled of alcohol and that he wanted to avoid further contact with him until police arrived (which he did by retreating to his truck). (Doc. 91-1, p. 392, 448–50; Doc. 91-2, pp. 13–14).

A short time later, at approximately 2:00 a.m., Homewood police officer Jason Davis arrived on the scene. (Doc. 91-2, p. 14). Officer Davis's blue lights were on; however, he turned off the video recorder before exiting his vehicle. (Doc. 91-3, p. 28). Officer Davis instructed the parties to move their vehicles in order to clear the roadway. (Doc. 91-3, p. 31). He told Ms. Barnette to pull her car

into one area of the lot and he instructed Mr. Stryker to move his truck to a side alleyway some distance away (approximately 50 feet from Ms. Barnette's vehicle). (Doc. 91-3, pp. 31–32; Doc. 101-9, p. 9). Mr. Stryker complied but pleaded with Officer Davis to leave his truck in a well-lighted space. (Doc. 91-2, p. 22). According to Mr. Stryker, Officer Davis became irritated and stated "if I didn't shut up he would lock my ass up."[5] (Doc. 91-2, pp. 20–21).

After moving the truck, Mr. Stryker, Mr. Ibedingl and Officer Davis walked around the truck to inspect it for damage. (Doc. 91-1, pp. 399–400; Doc. 91-2, p. 23). Officer Davis stated that he did not see any damage to the truck. (Doc. 91-1, p. 400; Doc. 91-2, p. 23). Officer Davis also indicated to Mr. Stryker that the accident occurred outside of his jurisdiction, and he would have to call authorities

---

[5] The record contains conflicting accounts of Officer Davis's alleged threat to Mr. Stryker (i.e. "to lock his ass up."). The second amended complaint alleges that the threat was made in response to Plaintiff's request to photograph Ms. Barnette's car. (*See* Doc. 69, p. 6, ¶ 29) ("When [plaintiff] tried to explain to Davis that Swift policy required him to photograph the alleged damage, Davis threatened . . . '[to] lock his ass up.'"). In his deposition, Plaintiff offered two scenarios for when the threat was made. *Compare* Doc. 91-2, p. 20 ("So I said, Officer, where I am parked now is well lighted . . . . So why can't we just let me leave it here . . . . Officer Davis got really mad and said 'if I didn't shut up, he was locking my ass up.'") *with* Doc. 91-2, p. 22 ("The light business [and Officer Davis's threat] was after I moved my truck."). Plaintiff's brief in opposition to summary judgment alleges an entirely different scenario as to when Officer Davis made the alleged threat. (*See* Doc. 100, p. 4, n. 2) ("When he [plaintiff] asked Davis if he would get Barnette to move her car so that [he] could get his truck out of the way . . . , Davis got upset and 'told me if I didn't shut up he would lock my ass up.'"). As discussed in the analysis portion of this opinion, in ruling on the present motions, the Court does not credit Plaintiff's self-contradictory testimony. *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1286 (11th Cir. 2003) (affirming district court's grant of summary judgment in defendant's favor where plaintiff's witnesses offered "self-contradicting testimony"); *see also Wright v. DISH Network, LLC*, 4:15-CV-0167-HLM, 2016 WL 10919655, *5 (N.D. Ga. Dec. 1, 2016) ("Even on summary judgment, the Court must construe [plaintiff's] self-contradictory testimony against her, as she has provided no explanation for the contradiction."), *aff'd* 714 Fed. Appx. 951 (11th Cir. 2017).

from the proper jurisdiction to come and investigate.[6] (Doc. 91-1, p. 400). Officer Davis testified that Mr. Stryker became agitated at this point and began speaking loudly in another language or in a thick accent which Officer Davis could not understand. (Doc. 91-3, pp. 32–33).

After walking around the truck, Mr. Stryker and Mr. Ibedingl returned to the truck. (Doc. 91-1, p. 400). Mr. Stryker then remembered that his company policy requires him to take photographs of any damage in the event of an accident, and so he retrieved his company camera from the cab of his truck and began walking toward Ms. Barnette's vehicle. (Doc. 91-1, pp. 400–401). However, Officer Davis stopped him and asked what he had in his hand. (Doc. 91-1, pp. 400–401). Mr. Stryker explained that it was a camera, and that his company policy required him to photograph any damage resulting from an accident. (Doc. 91-2, p. 31; Doc. 91-1, pp. 402–04). Officer Davis told Mr. Styker that he could not take any photos, and that he should put the camera away. (Doc. 91-2, p. 31; Doc. 91-3, pp. 35–36).

Mr. Stryker contends that Officer Davis told him to place the camera in his pocket, but that as a former police officer himself, he was fearful to do that knowing that an officer could mistake reaching into a pocket as reaching for a weapon. (Doc. 91-1, pp. 414–15; Doc. 91-2, p. 30). Nonetheless, Mr. Stryker

---

[6] There was confusion initially as to which city or municipality had police jurisdiction. Officer Davis testified that once he determined that the accident occurred outside of the city limits of Homewood, his sole purpose on the scene was to determine which authorities should be called to investigate. (Doc. 91-3, pp. 29–30).

attempted to place the camera in his pocket, at which point Officer Davis drew his weapon. (Doc. 91-1, p. 414; Doc. 91-3, p.35). Mr. Stryker asked Officer Davis "are you going to kill me?" (Doc. 91-1, p. 415; Doc. 91-2, p. 31). Once Officer Davis realized that Mr. Stryker had a camera (and not a weapon), he re-holstered his firearm, and suggested to Mr. Stryker that he return to his truck. (Doc. 91-1, pp. 36, 146–48, 415; Doc. 91-3, pp. 35–36). Mr. Stryker testified that at this point Officer Davis shoved him. (Doc. 91-1, p. 405; Doc. 91-2, p. 33). Officer Davis claims that he merely redirected Mr. Stryker by placing his hand on Mr. Stryker's shoulder, at which time Mr. Stryker attempted to elbow him but missed. (Doc. 91-1, p. 39–40, 41; Doc. 91-3, p. 36; Doc. 91-2, p. 35). Officer Davis testified that in response to Mr. Stryker swinging his elbow, he (Officer Davis) employed a maneuver known as an "arm bar takedown," but that Mr. Stryker spun around and evaded him and began walking back to his truck. (Doc. 91-1, p. 46; Doc. 91-3, p. 37). Mr. Stryker denies attempting to elbow Officer Davis. (Doc. 91-1, p. 482).

As Mr. Stryker walked away, Officer Davis tased Mr. Stryker in the back. (Doc. 91-2, p. 37). Officer Davis testified that he did this in response to Mr. Stryker trying to elbow him and evading the arm-bar takedown. (Doc. 91-3, p. 37). After getting tased, Mr. Stryker began crawling toward the truck. (Doc. 91-2, pp. 37–38). Mr. Stryker testified that after Officer Davis tased him, he realized that he was under arrest. (Doc. 91-2, p. 46). However, he also believed that Officer Davis

was trying to kill him, so he sought to return to his truck for safety. (Doc. 91-2, pp. 38–39). Meanwhile, Officer Davis requested 9-1-1 backup through his chest microphone. (*See* Doc. 91-5) (9-1-1 audio recording conventionally filed with Clerk of Court). Officer Davis then tased Mr. Stryker a second time. (Doc. 91-3, p. 39). Mr. Stryker continued his efforts to climb into the truck. (Doc. 91-1, p. 412). Mr. Stryker testified: "The officer walked away so I started dragging myself to get into the truck to get away from him." (Doc. 91-1, p. 412). Officer Davis pursued him up the stairs, struck him in the neck region, and tugged on his legs to pull him down. (Doc. 91-1, pp. 412–13). However, Mr. Stryker clutched the safety bar in the driver's side of the cabin and refused to let go. (Doc. 91-1, p. 417).

Mr. Stryker then climbed into the cab of the truck, rolled up the window, and locked the driver's side door. (Doc. 91-1, pp. 418–19; Doc. 91-3, p. 39). Mr. Stryker yelled at Mr. Ibedingl, who was standing nearby, to get into the passenger side of the truck, which he did. (Doc. 91-1, p. 418). Officer Davis then used his police baton to break the driver's side window, causing glass to shatter in Mr. Stryker's face. (Doc. 91-1, pp. 420–21; Doc. 91-3, pp. 39–40). Mr. Stryker began sliding to the passenger side of the cabin and Mr. Ibendingl exited the truck. (Doc. 91-1, p. 426). Officer Davis entered the passenger side and attempted a second time to remove Mr. Stryker from the truck. (Doc. 91-1, p. 426; Doc. 91-3, pp. 41–

42). Mr. Stryker clutched the safety bar in the passenger side of the truck. (Doc. 91-2, p. 44). At some point during the struggle, Officer Davis sprayed chemical spray in Mr. Stryker's face and struck him with his fist several times in the carotid artery and wrist and hand area (in an effort to force him to loosen his grip). (Doc. 91-3, p. 42). Officer Davis testified that he "hammer-fisted"[7] Mr. Stryker and denies hitting Mr. Stryker with his baton. (Doc. 91-3, p. 42). Mr. Stryker alleges that Officer Davis hit him in the head and neck with an object or a "blunt instrument." (Doc. 69, p. 7, ¶ 39; Doc. 91-1, p. 412). Officer Davis testified that he punched Mr. Stryker in the back a number of times in an effort to bring him out of the truck. (Doc. 91-1, p. 225).

Officers Blake and Waid, each of whom were on duty at the time, appeared on the scene in separate vehicles. (*See* Doc. 91-1, pp. 200–04; Doc. 91-1, pp. 245–46). Both heard the distress call from Officer Davis requesting back-up. (*See* Doc. 91-1, pp. 201–03; Doc. 91-1, p. 245–46). Officer Blake appeared first and observed a struggle between Officer Davis and Mr. Stryker as Mr. Styker held onto the safety bar in the passenger side of the truck and Officer Davis attempted to remove him. (Doc. 91-1, pp. 209–10). Officer Blake ordered Mr. Stryker to "let go" and then tugged on Mr. Stryker's belt and punched him in the kidney area. (Doc. 91-1, pp. 212–15, 217–18; Doc. 91-10, p. 44). Mr. Stryker eventually

---

[7] A "hammer fist" is described in the record as a strike in a karate-chop type motion with the soft tissue of the hand. (Doc. 91-1, pp. 65, 253; Doc. 91-3, p. 43).

released the safety bar and Officer Blake forced him to the ground. (Doc. 91-10, pp. 47–48). Once on the ground, Officer Blake put both of his knees on Mr. Stryker's back. (Doc. 91-10, pp. 49, 53). Officer Blake told Mr. Stryker "stop resisting" and "give us your hands." (Doc. 91-10, pp. 54, 56, 68).

Officer Waid approached and observed Officers Davis and Blake in a struggle to remove Mr. Stryker from the vehicle. (Doc. 91-1, pp. 249–50). Officer Waid testified that after Officers Davis and Blake put Mr. Stryker on the ground, he (Mr. Stryker) was still resisting and fighting. (Doc. 91-1, p. 252). Officer Waid then "hammer fisted him three to five times in the jaw or the ear, maybe the side of the neck" in order to gain compliance. (Doc. 91-11, pp. 47–48).

Mr. Stryker denies that he resisted the officers' attempts to handcuff him (Doc. 91-2, p. 48), and alleges that the officers continued to kick him and "choke him"[8] even after handcuffs were placed on him.[9] (Doc. 91-2, p. 49). Mr. Stryker

---

[8] By "choking," Plaintiff clarified in his deposition that he was referring to a choke hold that one or more officers had on his biceps, not his neck. (Doc. 91-2, p. 49).

[9] Plaintiff offers varying testimony in his deposition concerning whether he was kicked or stepped on after he was placed in handcuffs. Plaintiff initially stated that after he was handcuffed, "I was still being kicked . . . . I was lying there for a while and I was still being kicked and they were still making the expression as though they didn't have my arm." (Doc. 91-2, p. 49). Later in his deposition, Plaintiff testified:

> Q. Were you kicked in your back?
> A. I was kicked in my back earlier.
> Q. I'm talking about you're taken out of the truck and put on the ground.
> A. Not that I remember.
> Q. Okay. Did anybody stomp on your back after you're taken out of the truck and put on the ground?
> A. Not that I remember.

recalls hearing Officer Blake command him to "stop resisting" and to "give us your hands." (Doc. 100, p. 17, ¶ 12). Once restrained, Mr. Stryker testified that Officers Davis, Blake and Waid dragged him across the parking lot. (Doc. 91-1, pp. 428–29, 434, 477–78). Mr. Stryker was then placed under arrest and put in a police car without further incident. (*See* Doc. 91-1, p. 435).

Mr. Ibedingl was also placed in handcuffs but was released shortly thereafter. (Doc. 91-1, p. 352). Mr. Ibedingl was not arrested or charged with a crime. (Doc. 91-1, p. 353).

After the dust settled, one of the officers transported Mr. Stryker directly from the Walmart shopping center to UAB hospital for treatment. (Doc. 91-1, p. 435–36). Mr. Stryker suffered a broken jaw which required surgery. (Doc. 69, p. 17, ¶ 81; Doc. 91-1, p. 479). Emergency room staff also removed glass from Mr. Stryker's face and eyes. (Doc. 69, p. 17, ¶ 80). Mr. Stryker's jaw was wired shut for approximately eight weeks in order to allow it to heal. (Doc. 69, p. 17, ¶ 81).

---

Q. All right. Did –
A. Those were still before.
Q. Did anybody strike you in the back in any kind of way after you're taken out of the truck and put on the ground?
A. Not that I remember.

(Doc. 91-2, p. 51). The Court addresses this apparent discrepancy in the discussion section of this opinion.

Mr. Stryker also suffered back injuries requiring surgery and which prevent Mr. Stryker from returning to work as a truck driver.  (Doc. 69, p. 17, ¶ 83).[10]

The City brought a criminal action against Mr. Stryker, styled *City of Homewood v. Stryker*, CC-2015-3645 and CC-2015-3646, filed in the Circuit Court of Jefferson County, Alabama, on charges of disorderly conduct, resisting arrest, and refusal to comply with a lawful order.  (Doc. 101-3; Doc. 101-5; Doc. 101-6; Doc. 101-8).  Prior to the criminal trial, the City dismissed the charges against Mr. Stryker for assault and disorderly conduct.  (*See* Doc. 101-7, pp. 2, 3). Following a jury trial, Mr. Stryker was acquitted on the charge of resisting arrest (Doc. 101-4, p. 2).  Mr. Stryker was convicted on the charge of refusal to comply with a lawful order.  (Doc. 91-7, p. 2; Doc. 91-8, p. 2).  The trial order states in relevant part:

> **10/21/16**    On this date the jury returned its verdict which read, 'We, the jury find the Defendant, **Moses Jutomue Stryker**, Guilty of **Refuse to Comply with Lawful Order** as charged in the complaint,' and was signed by the foreperson, **Lisa Arrington**.  In accordance with the jury verdict the Court therefore Adjudges you Guilty.

---

[10]  Aside from the allegations contained in the second amended complaint, the Court has not located any medical evidence in the record concerning the nature and extent of Plaintiff's injuries.  This is perhaps due to the prior Court's bifurcation of discovery to determine whether the defendants are entitled to qualified immunity before reaching the liability phase of the case.  (*See* Doc. 80 – Order Granting Motion to Bifurcate Discovery).  In any event, because the parties apparently do not dispute the extent of Plaintiff's injuries, the Court accepts the allegations in the second amended complaint as true, and assumes for summary judgment purposes that Plaintiff suffered a broken jaw and back injuries.

It is the sentence of the Court that the Defendant, **Moses Jutomue Stryker**, is fined the sum of **$500 plus court costs**, which shall be paid in full by **9:00 A.M. on January 19, 2017**.

(Doc. 91-8, p. 2) (bold supplied in original).

## III.    Procedural History

Prior to the reassignment of this case to the undersigned, the City and Officers Blake and Waid filed a motion to dismiss.  (*See* note 1, *supra*, and Docs. 40, 44).   Officer Davis did not join in the motion.   The Court, Hopkins, J., determined that the motion filed by Officers Blake and Waid was due to be granted with respect to all alleged conduct occurring prior to Mr. Stryker's removal from the truck.  *See Stryker v. City of Homewood et al.*, 2:16-CV-0832-VEH, 2017 WL 3191097, *11–19 (N.D. Ala. July 28, 2017) ("The officers' motion is GRANTED as to all of the Plaintiff's claims relating to his removal from the vehicle.").   In light of Judge Hopkins's ruling, this Court, in ruling on the present motion for summary judgment, will not consider any alleged conduct concerning Officers Blake and Waid occurring prior to Mr. Stryker's removal from the truck. Consistent with the Court's ruling on the motion to dismiss, the Court will only consider the conduct of these officers as it relates to events occurring after Mr. Stryker was outside of the truck and on the ground.   The Court's inquiry concerning Officer Davis's conduct is not limited in scope as Officer Davis was not a party to the motion to dismiss.

## IV.    Discussion

To recap the claims in this matter, as against Officers Davis, Blake, and Waid, Mr. Stryker asserts a Section 1983 excessive force claim as well as state law claims for assault and battery, negligence and wantonness.  Against the City, Mr. Stryker asserts a single count under Section 1983 for failure to train and supervise. The Court will first address Mr. Stryker's Section 1983 claim against the individual defendants.  In light of the Court's partial dismissal of the Section 1983 claim against Officers Blake and Waid, the Court analyzes the claim separately as it relates to Officer Davis, and will then turn to the "post-removal from the truck" conduct involving Officers Blake and Waid.  The Court will then turn to Mr. Stryker's Section 1983 claim against the City, and will conclude with a discussion of Mr. Stryker's remaining state law claims.

### A. Section 1983 Excessive Force Claims

Section 1983 creates a private right of action for constitutional violations committed by persons acting under "color of state law."  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258 (1981); *see generally Monroe v. Pape*, 365 U.S. 167 (1961).  The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws, shall be liable to the party injured in an action
at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Section 1983 is not itself a source of substantive rights; it
instead provides a method for vindicating federal rights elsewhere conferred.
*Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979). In cases alleging excessive
force incident to an arrest, the source of federal rights arises under the Fourth
Amendment's protections against unreasonable searches and seizures. *Graham v.
Connor*, 490 U.S. 386, 394 (1989) ("Where, as here, the excessive force claim
arises in the context of an arrest or investigatory stop of a free citizen, it is most
properly characterized as one invoking the protections of the Fourth Amendment,
which guarantees citizens the right "to be secure in their persons ... against
unreasonable ... seizures" of the person."); *Lee v. Ferraro*, 284 F.3d 1188, 1197–98
(11th Cir. 2002) ("The Fourth Amendment's freedom from unreasonable searches
and seizures encompasses the plain right to be free from the use of excessive force
in the course of an arrest.").

While Section 1983 creates a private right of action for constitutional
violations by government officials, the doctrine of qualified immunity
simultaneously operates to provide a shield from liability to government officials
performing discretionary functions. *See generally Case v. Eslinger*, 555 F.3d
1317, 1326 (11th Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)
("'Qualified immunity balances two important interests—the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction and liability when they perform their duties reasonably.'")).   The purpose of qualified immunity is to ensure that government officials are not required to "err always on the side of caution because they fear being sued."  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law."  *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (internal quotations and citations omitted).

### 1. Qualified Immunity Standard

To receive qualified immunity, the public official carries the initial burden of demonstrating that "he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred."  *Courson v. McMillan*, 939 F.2d 1479, 1487 (11th Cir. 1991).  If the defendant is not acting within the scope of his discretionary authority, he may not enjoy the benefit of qualified immunity.  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

In the present case, no question exists as to whether Officers Davis, Blake and Waid were acting in a discretionary capacity while arresting Mr. Stryker.  The burden therefore shifts to Mr. Stryker "to show that qualified immunity is not appropriate."  *Lee*, 284 F.3d at 1194.  The United States Supreme Court has set

forth a two-part test for determining the appropriateness of a qualified immunity defense. *See Saucier v. Katz*, 533 U.S. 194 (2001), *receded from by Pearson v. Callahan*, 555 U.S. 223 (2009).[11] Under *Saucier*, a court must ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. If a constitutional right would have been violated assuming the plaintiff's version of the facts as true, the court must then determine "whether the right was clearly established." *Id*.

### a. Constitutional Violation

The Eleventh Circuit has identified the following considerations, conceptualized as the "Graham factors," for determining whether an excessive force claim amounts to a constitutional violation:

> In order to determine whether the amount of force used by a police officer was proper, a court must ask "whether a reasonable officer would believe that this level of force is necessary in the situation at hand." [*Willingham v. Loughnan,* 261 F.3d 1178, 1186 (11th Cir. 2001).] The Supreme Court has held that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the

---

[11] In *Pearson*, the United States Supreme Court held that courts may exercise their discretion in applying the two-part test under *Saucier* in whatever order is best suited to the facts of the case. 555 U.S. at 810 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."). The *Pearson* Court noted that cases at the pleading stage may be best suited for reordering the sequence because in the early stages of litigation, "the precise factual basis for the plaintiff's claim or claims may be hard to identify. *Id*. at 822. As the parties in the present case are well beyond the pleading stage, the Court finds that the traditional application of *Saucier* is appropriate.

Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1871 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (internal quotations omitted)). Moreover, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396, 109 S.Ct. at 1871–72 (citing *Terry v. Ohio,* 392 U.S. 1, 22–27, 88 S.Ct. 1868, 1880–83, 20 L.Ed.2d 889 (1968)).

The Supreme Court has established that, in order to balance the necessity of using some force attendant to an arrest against the arrestee's constitutional rights, a court must evaluate a number of factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.,* 109 S.Ct. at 1872. . . . *Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.

*Lee,* 284 F.3d at 1197–98.

Importantly, the excessive force inquiry requires the Court to consider what a reasonable *officer* would do under the circumstances. *Vinyard v. Wilson,* 311 F.3d 1340, 1346 (11th Cir. 2002) ("An officer will be entitled to qualified immunity if his actions were objectively reasonable, that is[,] if an objectively reasonable officer in the same situation could have believed that the force used was not excessive."); *Garczynski v. Bradshaw,* 573 F.3d 1158, 1166 (11th Cir. 2009)

("The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded."). The Eleventh Circuit has also instructed district courts to consider the facts—albeit in a light most favorable to the plaintiff—through the lens of the officer(s) involved, and not merely "from the comfort and safety of our chambers." *Crosby v. Monroe Co.*, 394 F.3d 1328, 1333–34 (11th Cir. 2004) ("We must see the situation through the eyes of the officer on the scene who is hampered by incomplete information and forced to make a split-second decision between action and inaction where inaction could prove fatal."). "Qualified immunity thus represents the rule, rather than the exception: 'Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity.'" *Sanders v. Howze*, 177 F.3d 1245, 1249 (11th Cir. 1999) (quoting *Lassiter v. Alabama A & M Univ. Bd. of Trustees,* 28 F.3d at 1146, 1149 (11th Cir. 1994) (en banc)).

After a careful review of the evidence, and viewing the facts in the light most favorable to Mr. Stryker, as the Court must pursuant to the Rule 56 standard and the mandate of *Saucier*, the Court finds that the *Graham* factors weigh in favor of the individual defendants.

### (i) Officer Davis

As to the first question under *Graham* (i.e. the severity of the crime at issue), Mr. Stryker argues that because he did not commit any serious criminal offense, no

force was necessary at all. Mr. Stryker points to the fact that Officer Davis was on the scene to investigate a minor traffic accident, and to determine which city had jurisdiction. Officer Davis argues that the state court has already determined that Mr. Stryker failed to comply with a lawful order, and based on the criminal conviction, there can be no question that probable cause existed for Mr. Stryker's arrest. He argues further that under the *Heck* doctrine, as espoused in *Heck v. Humphrey*, 512 U.S. 477 (1994), Mr. Stryker may not attack the validity of his state court conviction by claiming that his arrest was not justified. To be clear, Officer Davis does not seem to argue that *Heck* bars Mr. Stryker's entire Section 1983 claim, but rather, that it prevents him from arguing that no probable cause existed for his arrest or that he did not fail to comply with Officer Davis's orders. (*See* Doc. 92, p. 23, n. 9). Mr. Stryker argues, in turn, that *Heck* is inapposite to his excessive force claim because the state court conviction is not clear as to which of Officer Davis's orders Mr. Stryker failed to follow and, notwithstanding this ambiguity, a finding in his favor on his Section 1983 claim would not invalidate the criminal conviction for failure to obey a lawful order.

In *Heck*, the United States Supreme Court determined that a Section 1983 claim is precluded if an award in the plaintiff's favor would have the effect of invalidating a state court conviction or sentence. *Heck*, 512 U.S. at 486–87. However, if a finding in the plaintiff's favor on a Section 1983 claim would not

invalidate the criminal conviction or sentence, the *Heck* doctrine does not apply and the plaintiff may proceed with his Section 1983 action. *Id*. In applying *Heck*, the federal court must carefully analyze the relationship between the plaintiff's § 1983 . . . claims and the charge on which the plaintiff was convicted." *See* Post-Conviction Remedies § 11:2 (July 2018).

The jury in the underlying criminal action, *see City of Homewood v. Stryker*, CC-2015-3645 and CC-2015-3646, found Mr. Stryker guilty of failure to obey a lawful order "as charged in the Complaint." (Doc. 91-8, p. 2). The criminal complaint provides the following narrative:

> Stryker refused several times of my commands for him to get back in his vehicle. He also turned and tried to walk away from me, again refusing to comply with my orders.

(Doc. 101-8, p. 2; Doc. 108-1, p. 2). Based on this complaint, and following a three-day trial on the matter, the jury determined that sufficient evidence existed to convict Mr. Stryker for failure to obey a lawful order.

As an initial matter, Officer Davis's reliance on *Heck* is misplaced. Simply put, a finding in Mr. Stryker's favor on a Section 1983 claim would not invalidate Mr. Stryker's criminal conviction for failure to obey a lawful order. The officers could have still used excessive force in effecting Mr. Stryker's arrest even though Mr. Stryker failed to obey a lawful order. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008) (citing *Bashir v. Rockdale County, Ga.*, 445 F.3d 1323, 1332

(11th Cir. 2006) ("A genuine excessive force claim relates to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest.")).

At the same time, this Court will not disregard the jury's findings. Probable cause for Mr. Stryker's arrest was conclusively established based on the state court conviction. *See Quire v. Miramar Police Dep't*, 595 Fed. Appx. 883, 886 (11th Cir. 2014) ("[W]here the plaintiff was convicted of the offense for which she was allegedly falsely arrested, that judgment of conviction conclusively establishes that the arrest was made with probable cause, absent a showing of fraud, perjury or corrupt means.") (internal quotations and brackets omitted).[12] The fact that Officer Davis's complaint could have been more specific or artfully drafted does not provide a basis for this Court to disregard the state court conviction. *See generally Lee*, 284 F.3d at 1195–96 (the fact that the officer did not cite a specific ordinance in his arrest report is irrelevant where probable cause exists for the arrest); *Bailey v. Bd. of County Comm'rs of Alachua County*, 956 F.2d 1112, 1119 (11th Cir. 1992) (finding arrest proper on charges of bribery, unlawful compensation, and unlawful possession of money in jail even though arrest report contained only a vague charge for conveying tools into jail to aid escape). Thus, the Court rejects

---

[12] The plaintiff in *Quire* asserted Section 1983 claims for false arrest and false imprisonment. Although *Quire* did not involve an excessive force claim, the Court finds that its principles are instructive concerning the manner in which a district court should view a state court criminal conviction, specifically, when a plaintiff in a subsequent federal court action challenges probable cause underlying his state court conviction.

Mr. Stryker's arguments which seek to either challenge probable cause for his underlying arrest or which are otherwise at odds with his criminal conviction for failure to obey Officer Davis's orders.[13] *See Martin v. Delcambre*, 578 F.2d 1164, 1165 (5th Cir. 1978)("The district court granted summary judgment for the appellees, holding that the appellant was collaterally estopped from relitigating the facts undergirding these claims so long as the state court conviction, which had resolved them against him, was still valid. Our cases fully support the district court's conclusion."); *Anderson v. Tyus*, No. 4:06CV004 SPMWCS, 2007 WL 2884367, at *6 (N.D. Fla. Sept. 27, 2007) ("Plaintiff asserts that at the outset of the riot he was not involved, and this must be assumed to be true on this motion for summary judgment. However, he was found guilty both in a prison disciplinary and criminal proceedings of striking Sergeant Childs without justification. Whatever the truth of the way in which Plaintiff, Childs, and Tyus interacted initially, the die is cast for Plaintiff: he struck Childs without justification. Plaintiff cannot attempt to prove otherwise in this case. To allow Plaintiff to prove his version of events, that he was restrained by Tyus in a chokehold and beaten by Childs and Tyus, and that he did not strike Childs without justification, would

---

[13] The Court also rejects Plaintiff's argument that the jury's acquittal of Mr. Stryker on charges of resisting arrest conclusively establishes that he did not attempt to flee or evade arrest. The Court gives credence to the jury's criminal conviction of Mr. Stryker for failure to obey a lawful order because Mr. Stryker was convicted on this charge. However, a reverse inference does not attach to what the jury *did not* conclude or decide.

necessarily imply the invalidity of the disciplinary action taken against him and his criminal conviction.").

Returning to the first *Graham* factor, the Court finds that Mr. Stryker's refusal to comply with Officer Davis's orders is sufficiently severe under the circumstances to justify the use of force against him. Mr. Stryker argues that "at worst, [Mr.] Stryker may have been suspected [of] the low-level misdemeanor of potentially leaving the scene of an accident." (Doc. 100, p. 31). This argument is problematic for two reasons. First, it ignores the reality that a hit and run is not a low level offense. *See* Ala. Code. § 32-10-6 (1975) (describing hit and run as a Class A misdemeanor *or* a Class C felony depending on whether persons are injured). Second, it ignores the fact that the impetus for Officer Davis's use of force was not the traffic accident, but Mr. Stryker's failure to obey orders. The jury determined that Mr. Stryker was guilty of failure to obey orders as charged in the complaint. That complaint reflects that Officer Davis issued two directives to Mr. Stryker—including an initial command to return to his truck and a later command to stay put. (Doc. 108-1, p. 2). As already noted, Mr. Stryker may not now feign confusion over the nature of the orders at issue, as it was clear enough to the jury in the underlying criminal action that Mr. Stryker failed to follow orders, resulting in an objectively reasonable need for Officer Davis to use some level of force to bring Mr. Stryker into compliance.

The next two factors under *Graham* (i.e. whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight) may be examined together. Mr. Stryker argues that he did not swing an elbow at Officer Davis, and therefore, Officer Davis had no justification for tasing him. Once again, however, this argument ignores the fact that the precipitating event for the use of force was Mr. Stryker's failure to follow Officer Davis's orders. This argument also selectively overlooks the escalation that ensued as a result of Mr. Stryker's failure to follow those orders.

Mr. Stryker acknowledges that Officer Davis had a reasonable basis for drawing his weapon—that is, he admits that a reasonable officer could have construed his movements in putting the camera in his pocket as reaching for a weapon. (Doc. 100, p. 20) ("[Mr.] Stryker does not claim that [Officer] Davis has any liability to him for drawing his weapon."). Nevertheless, following this tense exchange, Mr. Stryker opted to walk away from Officer Davis, prompting Officer Davis to use an arm bar takedown (which was not effective) and then to use his taser in a further effort to bring Mr. Stryker into compliance. Even if the Court were to assume that Mr. Stryker did not swing his elbow at Officer Davis, the Court finds that Officer Davis's decision to tase Mr. Stryker at this point was objectively reasonable in light of Mr. Stryker's failure to follow Officer Davis's

commands.  *See generally*, *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (approving use of a taser against a suspect at a traffic stop who did not comply with verbal commands and who used profanity, moved around and paced in agitation, and yelled at the officer); *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011) ("And, where a suspect appears 'hostile, belligerent, and uncooperative,' use of a taser might be preferable to a 'physical struggle [causing] serious harm' to the suspect or the officer.") (quoting *Draper*, 369 F.3d at 1278).

Mr. Stryker argues that he did not attempt to escape or flee, and that he was merely trying to comply with Officer Davis's command to return to his truck. (Doc. 100, p. 32).  This argument (once again) asks the Court to disregard the jury's contrary findings in the underlying criminal action.  Moreover, Mr. Stryker's own testimony contradicts the assertion that he complied with Officer Davis's orders.  Mr. Stryker admits that after being tased, he knew that Officer Davis was trying to arrest him.  (Doc. 91-2, p. 46).[14]  In spite of this, Mr. Stryker attempted to flee from Officer Davis.  (*See* Doc. 91-1, p. 412) ("I started dragging myself to get into my truck to get away from him."); (Doc. 91-1, p. 413) ("I was trying to get in the truck away from him."); (Doc. 91-1, p. 417) ("I wanted to get away from

---

[14] Plaintiff testified:

> Q. Is it fair to say that at the point Officer Davis tases you – that at the point Officer Davis tases you that you realize he's trying to arrest you?
> A. Yes.

(Doc. 91-2, p. 46).

Officer Davis."). Mr. Stryker also admits that he evaded Officer Davis by clutching the safety bar in the cabin, securing himself inside the truck, and then locking the doors and rolling up the windows. (Doc. 91-1, pp. 417–19). Mr. Stryker's assertion in his brief that he did not attempt to flee or evade arrest is simply not supported by the record evidence and, in fact, is contradicted by Mr. Stryker's own testimony. As such, Mr. Stryker's persistent arguments in his brief that he did not attempt to flee or evade arrest lack merit, and do nothing to advance his excessive force claim. *See Dukes v. Deaton*, 852 F. 3d 1035, 1046 (11th Cir. 2017) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *see also Evans*, 762 F.3d at 1294 ("For factual issues to be considered genuine, they must have a real basis in the record.") (internal quotations omitted).

Mr. Stryker argues further that "any reasonable officer in this situation would know that [Mr.] Stryker was not attempting to flee or escape by trying to get into a cumbersome, 18-wheeler truck that could not . . . be cranked and made to zoom away." (Doc. 100, p. 34). The Court disagrees with this oversimplified assessment of the dangers attendant to having an already flight-bound suspect, along with another individual, locked inside of an eighteen wheeler, with only one officer on the scene at the time, as well as innocent bystanders—Ms. Barnette and Mr. Bailey—on foot nearby. More importantly, Mr. Stryker admits that he

understood that Officer Davis was trying to arrest him, but he continued to flee Officer Davis and evade arrest.

Relying on *Ex parte Wallace*, 497 So.2d 96 (Ala. 1986), Mr. Stryker argues that he "had a right to protect himself from [Officer] Davis's unlawful conduct during the arrest." (Doc. 100, p. 34). In *Wallace*, the Alabama Supreme Court recognized that in very limited circumstances, a "citizen may resist an attempt to arrest him which is simply illegal." *Id*. at 97. *Wallace* has no application here because Mr. Stryker was not subjected to an unlawful arrest. As a consequence of Mr. Stryker's criminal conviction, there can be no question that probable cause existed for Mr. Stryker's arrest. *Quire*, 595 Fed. Appx. at 886 (finding that probable cause is conclusively established in light of a state court conviction). Additionally, Mr. Stryker voluntarily dismissed his claims in this action for unlawful arrest, further undermining the relevancy of *Wallace* to the present case.

Beyond the *Graham* factors, Mr. Stryker cites to numerous Eleventh Circuit cases for the proposition that "gratuitous force violates the Fourth Amendment." (Doc. 100, p. 38). However, the cases relied on by Mr. Stryker are distinguishable from the instant case as the arrestees were under control, not resisting, and obeying commands, or not otherwise under arrest. *See, e.g. Saunders v. Duke*, 766 F.3d 1262, 1265–66 (11th Cir. 2014) (officer slammed arrestee's face into hot pavement causing injuries to his face and jaw <u>after subject was placed in handcuffs</u>)

(emphasis added to *Saunders* and the following cases); *Fils*, 647 F.3d at 1291–92 (11th Cir. 2011) (arrestee tased <u>while he had his hands up and was not resisting</u>); *Payton v. City of Florence*, 413 Fed. Appx. 126, 132–33 (11th Cir. 2011) (officer twisted thumb of sixty year old woman <u>who was not under arrest</u>); *Oliver v. Fiorino*, 586 F.3d 898, 908 (11th Cir. 2009) (officer tased suspect multiple times <u>after subject was immobilized, limp, and writing in pain</u>); *Hadley*, 526 F.3d at 1330 (officer punched <u>non-resisting arrestee</u> in stomach); *Galvez v. Bruce*, 552 F.3d 1238, 1243–44 (11th Cir. 2008) (officer forcefully dragged and repeatedly slammed <u>non-resisting</u> arrestee's head into corner of a concrete structure <u>after arrestee was handcuffed</u>); *Reese v. Herbert*, 527 F.3d 1253, 1271 (11th Cir. 2008) (officer pepper sprayed <u>non-resisting</u> subject who was face down on the ground); *Walker v. City of Riveria Beach*, 212 Fed. Appx. 835, 838 (11th Cir. 2006) (officer struck arrestee in head with his gun even though arrestee was pulled over and <u>posed "no threat or risk" to the arresting officer</u>); *Davis v. Williams*, 451 F.3d 759, 767–68 (11th Cir. 2006) (officer manhandled individual who was <u>not actively resisting</u>); *Lee*, 284 F.3d at 1198 (officer slammed arrestee's head into trunk of car <u>after arrestee was placed in handcuffs and not resisting</u>); *Vinyard*, 311 F.3d at 1346 (officer grabbed arrestee by hair and arm and pepper sprayed her <u>after she was handcuffed and seated in the back of the patrol car</u>); *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (officer released police dog on

suspected burglar <u>after he had submitted to arrest</u> by lying on the ground); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (officer beat arrestee <u>after he was handcuffed and even though arrestee did not resist, attempt to flee, or struggle with the officers</u>); *Smith v. Mattox*, 127 F.3d 1416, 1419–20 (11th Cir. 1997) (officer broke arm of previously resisting arrestee <u>who was docile at the time of the arm break</u>).

The Court notes that Mr. Stryker offers conflicting testimony concerning the extent to which he was kicked after being removed from the truck and placed on the ground. In his brief in opposition to summary judgment, Mr. Stryker argues that Officer Davis (and Officers Blake and Waid) gratuitously kicked him and hit him after he was "in their control, compliant and lying face down." (Doc. 100, pp. 20–21). However, Mr. Stryker's deposition testimony appears to contradict this assertion. He initially testified that the kicking occurred before he was handcuffed but later testified that he did not recall being kicked (at least in his back) after being placed on the ground. Mr. Stryker testified:

> Q. Were you kicked in your back?
> A. I was kicked in my back earlier.
> Q. I'm talking about [when] you're taken out of the truck and put on the ground?
> A. Not that I remember.
> Q. All right. Did –
> A. Those were still before.
> Q. Did anybody strike you in the back in any kind of way after you're taken out of the truck and put on the ground?
> A. Not that I remember.

Q. Okay. Did anybody stomp on your back after you're taken out of the truck and put on the ground?
A. Not that I remember.

(Doc. 91-2, p. 51). Because Mr. Stryker offers self-contradictory testimony on this point, the Court need not consider this evidence. *Iraola*, 325 F.3d at 1286 (affirming district court's grant of summary judgment in defendant's favor where plaintiff's witnesses offered "self-contradicting testimony"); *see also Wright*, 2016 WL 10919655 at *5 ("Even on summary judgment, the Court must construe [plaintiff's] self-contradictory testimony against her, as she has provided no explanation for the contradiction."), *aff'd* 714 Fed. Appx. 951 (11th Cir. 2017). But even if the Court were to credit Mr. Stryker's testimony that he was kicked after being placed on the ground, his own testimony indicates that this was before handcuffs were placed on him. (Doc. 91-2, p. 49) ("But I do know this. I was lying there for a while and I was still being kicked and they were still making the expression as though they didn't have my arm."). If the officers were indicating that they did not have his arm (whether they actually had his arm or were merely "playing a game with him" as Mr. Stryker suggests), Mr. Stryker was still not in handcuffs at this point in time.

Based on the record evidence, the Court finds that the progressive amount of force used by Officer Davis was objectively reasonable under the circumstances. His efforts began with minimal force, and progressed to more aggressive methods

when the more minimal measures failed.  Mr. Stryker admits that he attempted to flee Officer Davis even after he realized that he was under arrest.  He also admits fighting off Officer Davis in an effort to return to his truck, clinging to the safety bar in two separate struggles, and refusing to exit his vehicle.  Finally, Mr. Stryker has failed to offer substantial evidence that excessive force was used on him after he was placed in handcuffs.  The conduct attributable to Officer Davis—including an arm bar takedown; tasing; attempting to pull Mr. Stryker from the truck by pulling on his waist and striking him in the hand and neck; striking him in the side of the face; and the use of chemical spray—was not excessive under the rapidly evolving circumstances of this case.

### (ii) Officers Blake and Waid

As to Officers Blake and Waid, the Court's excessive force inquiry is limited to the events occurring after Mr. Stryker was removed from the truck and on the ground.  Mr. Stryker testified that he is not sure about the specific conduct of Officers Blake and Waid.  However, we know based on the officers' own testimony that Officer Blake put his knees on his back once Mr. Stryker was out of the truck.  Officer Waid testified that he "hammer-fisted" Mr. Stryker in the head, neck and jaw area three to five times once Mr. Stryker was out of truck and on the ground.

The *Graham* factors weigh in favor of Officers Blake and Waid. As to the seriousness of the offense, both Officers Blake and Waid arrived on the scene in response to Officer Davis's request for backup. Both officers report having heard Officer Davis yelling for help and indicating that the suspect was not under control. Officer Blake testified that when he arrived on the scene, he observed a struggle between Officer Davis and Mr. Stryker (which is not disputed) as Officer Davis was attempting to apprehend Mr. Stryker from the vehicle. Mr. Stryker, meanwhile, was clutching the safety bar in the passenger side of the truck. Officer Blake then climbed up, punched Mr. Stryker in the kidney, and then assisted in bringing Mr. Stryker to the ground. The kidney punch, occurring while Mr. Stryker was still in the truck, is not under consideration here. As to the remaining conduct, Officer Blake put his knees on Mr. Stryker's back and assisted Officer Davis in trying to place handcuffs on Mr. Stryker. Officer Blake's use of force—amounting to placing his knees on Mr. Stryker's back, was not excessive as Mr. Stryker was posing a threat to the safety of the officers and actively attempting to evade arrest by planting himself in the vehicle, clutching the safety bar, and refusing to exit the vehicle voluntarily.

The amount of force used by Officer Waid, while a closer call, was not objectively unreasonable under the circumstances. Officer Waid testified that he hammer fisted Mr. Stryker in the side of the head and neck region three to five

times in order to gain compliance. He was the third officer on the scene and testified that he did not know whether Mr. Stryker was armed. (Doc. 91-1, p. 256). Officer Waid stated that he heard both the initial dispatch call and the later distress call from Officer Davis, and that when he arrived on the scene, he heard yelling, witnessed broken glass on the ground, and observed Officers Davis and Blake struggling to remove Mr. Stryker from the vehicle. (Doc. 91-1, p. 245–49). Based on the out-of-control nature of the scene, the Court cannot say that an objectively reasonable officer would have or should have used less force than Officer Waid. As previously discussed herein, Mr. Stryker cannot reasonably argue that the situation was anything less than out-of-control considering his own testimony that he was actively trying to evade arrest by entering his truck, clinging to the safety bar inside the cabin, and refusing to voluntarily exit the vehicle. While the Court must construe the facts in the light most favorable to Mr. Stryker, the Court is not required to discount the unfavorable portions of Mr. Stryker's own testimony in favor of an alternate version of events which better suits his position. It is unfortunate that the situation spiraled to the point of Mr. Stryker sustaining a broken jaw and back injuries. However, the Eleventh Circuit has upheld the right of law enforcement to use increasing force, even deadly force, in situations when an arrestee is non-compliant and where less aggressive measures have failed. *See e.g.*, *Garczynski*, 573 F.3d at 1170 ("The outcome of this situation was undeniably

a tragedy. In their efforts to prevent a suicide, the officers took a life. Yet the record reveals that their use of force was objectively reasonable considering all the circumstances from a reasonable officer's viewpoint. No constitutional violation occurred.").

### b. "Clearly Established"

Mr. Stryker has failed to satisfy the first element under *Saucier*, that is, that the officers violated his Fourth Amendment right to be free from the use of force. Accordingly, the Court's analysis as to the question of qualified immunity need not proceed further. However, assuming for the sake of argument that Mr. Stryker had demonstrated that Officers Davis, Blake and Waid violated his constitutional right to be free from the use of force, Mr. Stryker has failed to show that his right was clearly established at the time of the incident. In the Eleventh Circuit:

> There are two ways for a party to show that the law clearly established that a particular amount of force was excessive. The first is to point to a "materially similar case [that has] already decided that what the police officer was doing was unlawful." *Willingham*, 261 F.3d at 1187. Because identifying factually similar cases may be difficult in the excessive force context, we have recognized a narrow exception also allowing parties to show "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Priester*, 208 F.3d at 926 (*quoting Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997)). Under this test, the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in *Graham* and our own case law "inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Id.*

(*quoting Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

*Lee*, 284 F.3d at 1198–99. To satisfy his burden, a plaintiff must do more than "point to sweeping propositions of law and simply posit that those propositions are applicable." *Nicholson v. Georgia Dept. of Human Resources*, 918 F.2d 145, 147 (11th Cir. 1990). "The dispositive question is whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Poulakis v. Rogers,* 341 Fed. Appx. 523, 526 (11th Cir. 2009) (quoting *Saucier,* 533 U.S. at 202).

Mr. Stryker argues that "[t]here was ample relevant and 'clearly established' case law at the time of this incident to place the Defendant Officers on notice that kicking, punching and hitting Mr. Stryker while he was compliant, lying face down with his hands in the officers' control was a violation of his Fourth Amendment rights." (Doc. 100, p. 49). However, none of the cases relied upon by Mr. Stryker are factually similar. *See supra,* string citation at pages 30–31; *see also Vinyard,* 311 F.3d at 1355 ("We also find that . . . the law was clearly established [such] that Officer McCreless's conduct, as Payton describes it, violated her constitutional right to be free from excessive force. No objectively reasonable police officer could believe that, consistent with the dictates of the Constitution, he could grab a 60–year–old woman—who was suspected of no crime, who verbally objected to a search of her home in a non-belligerent manner and made no aggressive

movements, and who had already been pulled from the doorway for a fellow officer to enter—and twist her thumb up behind her back so severely that she suffered tendon damage and a possible bone fracture."); *Hadley*, 526 F.3d at 1333 ("We hold that a handcuffed, non-resisting defendant's right to be free from excessive force was clearly established[.]"); *Lee*, 284 F.3d at 1199 ("[A] reasonable officer could not possibly have believed that he then had the lawful authority to take her to the back of her car and slam her head against the trunk after she was arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed. Once an arrestee has been fully secured, such force is wholly unnecessary to any legitimate law enforcement purpose."); *Slicker*, 215 F.3d at 1233 ("[O]fficers used excessive force in beating Slicker even though he was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way."); *Fils*, 647 F.3d at 1289 ("Under either method, Bergert and Williams [the officers] should have known that their conduct violated Maurice's Fourth Amendment rights. Maurice was tased even though he committed at most a minor offense; he did not resist arrest; he did not threaten anyone; and he did not disobey any instructions (for none were given).").

Mr. Stryker has failed to identify any materially similar Eleventh Circuit case law that would have put the officers on notice that their conduct was in violation of Mr. Stryker's constitutional rights. The underlying criminal

conviction against Mr. Stryker combined with Mr. Stryker's own testimony concerning his attempts to flee Officer Davis and to further evade arrest obviate a conclusion, at least in this Court's mind, that the officers' conduct would not "inevitably lead every reasonable officer in the defendants' position to conclude the force was unlawful." *See Lee*, 284 F.3d at 1198–99. For this and the other reasons stated herein, the officers are entitled to qualified immunity and to summary judgment as to Mr. Stryker's Section 1983 claim.

## B. Section 1983 Claim Against the City

Mr. Stryker asserts in Count II of his second amended complaint that the City "permitted and ratified a policy, custom and practice among its police officers to unreasonably use excessive force during arrests, including routine arrests involving misdemeanors." (Doc. 69, p. 11, ¶ 62). More specifically, Mr. Stryker alleges that the City failed to properly train and supervise its officers in the proper use of force. (Doc. 69, p. 21, ¶ 98) (The described City policy, custom and practice permitting and encouraging the unconstitutional use of force against ordinary citizens . . . was reinforced by the City's failure to discipline or prosecute known incidents of improper use of excessive force, failure to adequately investigate claims of excessive force, failure to supervise problem officers, and failure to provide training to problem officers."). Mr. Stryker notes that Officer Davis and the City of Homewood has been sued on two other occasions for using

excessive force in the course of an arrest. (*See* Doc. 69, p. 12, ¶ 67, n. 2) (citing *Jackson v. City of Homewood et al.*, 2:12-cv-4199-KOB (N.D. Ala. 2014) and *Pettaway v. City of Homewood, et al.*, 2:16-cv-932-AKK (N.D. Ala. 2017).

*1. Judicial Notice of Jackson and Pettaway*

Before reaching the merits of Mr. Stryker's Section 1983 claims against the City, the Court adopts and incorporates herein Judge Hopkins's conclusions as to the dispositive weight of the two prior cases against Officer Davis and the City of Homewood. Judge Hopkins opined:

> The City notes, correctly, that the two lawsuits cited by the Plaintiff— *Jackson v. City of Homewood, et al.*, 2:12-cv-4199 and *Pettway v. City of Homewood, et al.*, 2:16-cv-932—both of which were filed in the Northern District of Alabama and alleged excessive force claims against Officer Davis and the City of Homewood (Doc. 41 at 9), provide no support the Plaintiff's claim. "Courts may take judicial notice of public records, such as a pleading filed in another court, because such documents are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *Navarro v. City of Riviera Beach*, 192 F. Supp. 3d 1353, 1364 (S.D. Fla. 2016) (quoting *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999)). "However, judicial notice may be taken only to establish what those documents contain, not the veracity of their contents." *Id.* (citing *Bryant*, 187 F.3d at 1278). The Court takes judicial notice of the <u>allegation</u> that the incident in *Pettway* occurred on June 5, 2014 (*See* doc. 1 at 2, ¶ 6 in *Pettway v. City of Homewood*, 2:16-cv-00932-AKK), a date which was <u>after</u> the date of the conduct alleged in the instant case. Neither the conduct alleged in *Pettway*, nor the filing of the suit itself, could have put the City on notice, <u>before the date of the events of the instant case</u>, of the need to train on the use of force. *See MacMillan v. Roddenberry*, No. 5:08-CV-351-OC-10GRJ, 2010 WL 668281, at *7, n. 5 (M.D. Fla. Feb. 19, 2010) (Hodges, J.), *aff'd*, 432 Fed.Appx. 890 (11th Cir. 2011) (and cases cited therein) (complaints made after the arrest at issue are

not relevant to whether city was on notice of incidents of abuse); *Timmons v. Polk Cty. Sheriff's Office*, No. 8:09-CV-1190-T-17TGW, 2009 WL 4249553, at *2 (M.D. Fla. Nov. 25, 2009) (Kovachevich, J.) ("Plaintiffs complaint on pages B15–B19 merely lists incidents and grievances that allegedly occurred after his incident."); *Thomas v. City of Clanton*, 285 F. Supp. 2d 1275, 1283 (M.D. Ala. 2003) (Thompson, J.) ("Thomas ... cannot demonstrate a 'pattern of constitutional violations ... such that the municipality knows or should know that corrective measures are needed' by relying ... on ... the Gomez complaint, which was filed six months after the incident involving Thomas.").

Similarly, the Court takes judicial notice that the allegations in *Jackson* have not been substantiated (*See* Doc. 35) (Stipulation of Dismissal) in *Jackson v. City of Homewood et al.*, 2:12-cv-04199-KOB), and thus the Plaintiff's reference to that case provides no support for the Plaintiff's claims. *See, e.g., Gold v. City of Miami,* 151 F.3d 1346, 1351 (11th Cir. 1998) (prior complaints must be shown to have been valid); *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) ("Brooks never demonstrated that past complaints of police misconduct had any merit."); *Montanez v. City of Orlando*, No. 614CV622ORL22TBS, 2015 WL 12778406, at *12 (M.D. Fla. Oct. 23, 2015) (Conway, J.), aff'd, 678 Fed.Appx. 905 (11th Cir. 2017) ("Because Montanez has not presented any evidence that the allegations of false arrest and excessive force made in the two other federal lawsuits filed against Sgt. Parker had any merit, they cannot establish past police misconduct of which the City was, or should have been, aware, for the purpose of showing that the City had a custom or policy condoning or permitting such behavior."); *Tolbert v. Trammell*, No. 2:13-CV-02108-WMA, 2014 WL 3892115, at *5 (N.D. Ala. Aug. 4, 2014) (Acker, J.) ("The Eleventh Circuit has held that complaints of police misconduct alone, without a demonstration that such complaints have merit, do not establish a pattern of similar constitutional violations and do not give the city notice of police misconduct.").

*Stryker v. City of Homewood*, No. 2:16-CV-0832-VEH, 2017 WL 3191097, at *10

(N.D. Ala. July 27, 2017) (emphasis in original).

For the purposes of ruling on the defendants' summary judgment motions, this Court likewise takes judicial notice of *Pettaway* and *Jackson* as providing no support for Mr. Stryker's claims in this action. As Judge Hopkins aptly stated, the plaintiff in *Pettaway* filed her complaint after the date of the conduct alleged in the instant case, and therefore, the allegations contained in that complaint could not put the City on notice of the need to train and supervise its officers on the use of force. Moreover, since the date of Judge Hopkins's ruling noted above, the plaintiff's claims in *Pettaway* have been dismissed. *See Pettway v. City of Homewood, et al.*, 2:16-cv-932 (Kallon, J.) (Doc. 36 – Memorandum Opinion and Order – granting city of Homewood's motion to dismiss with prejudice; Doc. 42 – Order dismissing without prejudice claims against individual defendants as a result of plaintiff's guilty plea on charges of trafficking narcotics). The allegations in *Jackson* have also not been substantiated—by virtue of the parties' joint stipulation of dismissal—and are of no utility here.

*2. Analysis of Section 1983 Claim Against the City*

"A municipality can be held liable under § 1983 for the unconstitutional actions of its employees only when the [city's] official policy causes a constitutional violation." *Martin v. City of Macon, Georgia, et al.*, No. 16-16-16103, 2017 WL 2859512, at *2 (11th Cir. July 5, 2017); *see also Garczynski*, 573 F.3d at 1170–71 (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115,

123 (1992) ("'[I]f a city employee violates another's constitutional rights, the city may be liable if it had a policy or custom of failing to train its employees and that failure to train caused the constitutional violation.'") (internal citations and quotations omitted)). However, in cases where no constitutional violation has occurred, the Court need not look further into the municipality's policies or customs. *Garczynski*, 573 F.3d at 1170 ("Analysis of a state entity's custom or policy is unnecessary . . . when no constitutional violation has occurred."); *see also Case,* 555 F.3d at 1328 (declining to review the sheriff's and city's customs and policies in the absence of a constitutional deprivation by the individual police officer); *Rooney v. Watson,* 101 F.3d 1378, 1381 (11th Cir. 1996) ("Since we have determined that Deputy Watson's conduct did not cause the Rooneys to suffer a constitutional deprivation, we need not inquire into Volusia County's policy and custom relating to patrol vehicle operation and training.").

Mr. Stryker failed to demonstrate that Officers Davis, Blake or Waid violated his constitutional rights by using excessive force. In the absence of a constitutional violation, the Court need not examine whether the City's policies violated Mr. Stryker's rights. *Garczynski*, 573 F.3d at 1171; *Case,* 555 F.3d at 1328; *Rooney,* 101 F.3d at 1381. The City is entitled to summary judgment as to Mr. Stryker's Section 1983 claim for failure to train and/or supervise its police force.

## C. State Law Claims

Mr. Stryker asserts state law claims against Officers Davis, Blake and Waid for assault and battery (Count III), negligence (Count IV), and wantonness (Count V). The jurisdictional basis for Mr. Stryker's state law claims is 28 U.S.C. § 1367, which provides a federal district court with discretion to exercise or to decline to exercise supplemental jurisdiction over state claims in which the court's jurisdiction is based upon a federal question. This Section provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

The notion of supplemental jurisdiction is "'a doctrine of discretion, not of plaintiff's right.'" *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988) (quoting *Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). A district court may decline to exercise supplemental jurisdiction in the following circumstances:

> (1) the claim raises a novel or complex issue of state law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> **(3) the district court has dismissed all claims over which it has original jurisdiction,** or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. 1367(c) (emphasis supplied). The United States Supreme Court has noted:

> [A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

Additionally, the Eleventh Circuit has observed that when a plaintiff's federal claims are dismissed, "there remains no independent original federal jurisdiction to support the Court's exercise of supplemental jurisdiction over the state law claims against the [d]efendant." *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1352 (11th Cir. 1997); *see also Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.").

Having already determined that Mr. Stryker's federal claims against the City and the individual defendants fail as a matter of law, the Court declines to exercise supplemental jurisdiction over Mr. Stryker's remaining state law claims. Pursuant to 28 U.S.C. § 1367(d), Mr. Stryker has thirty (30) days from the entry of this memorandum opinion and order to refile in state court. *See Personalized Media*

*Communications, LLC v. Scientific-Atlantic, Inc.*, 493 Fed. Appx. 78, 82, n. 1 (11th Cir. 2012) (interpreting 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted [based on supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed.")).

## V.     Conclusion

For the foregoing reasons, summary judgment is hereby **GRANTED** in favor of the City and the individual defendants as to Mr. Stryker's Section 1983 claims (Counts I and II). The Court declines to exercise supplemental jurisdiction over Mr. Stryker's state law claims as set forth in Counts III, IV, and V. The state law claims are therefore **DISMISSED WITHOUT PREJUDICE**. Mr. Stryker shall have thirty (30) days from the entry of this judgment to refile his state law claims in state court. The Court will enter a separate order contemporaneously herewith.

**DONE** and **ORDERED** January 9, 2019.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE